Oakwood Mobile Homes, Inc. (Oakwood) — a defendant in a case pending in the Tuscaloosa County Circuit Court — appeals from the trial court's order denying its motion to compel arbitration of the plaintiffs' claims. The remaining defendants Jerry Edmondson and Mike Clary do not appeal. We reverse and remand.
The plaintiffs Larry Barger and Donna Barger purchased a mobile home from Oakwood, a mobile home manufacturer and dealer, in late July 1997. Larry signed one set of documents relating to the closing on one day and a second set the next day. The Bargers claim the first set included a "Contract to Purchase and Deposit Agreement" setting the total purchase price at $22,000.00. The Bargers claim that Oakwood salesman Jerry Edmondson and Oakwood manager Mike Clary represented the second set of documents as being "for insurance purposes," so Oakwood could move the mobile home to the Bargers' lot. Larry did not notice any arbitration agreement among any of the documents he executed.
About 10 months after the closing, the Bargers received from Oakwood copies of the documents purporting to be the closing documents. Included was a "Contract to Purchase and Deposit Agreement" showing the total purchase price as $40,014.23 rather than the $22,000.00 the Bargers remembered. Also included was an Arbitration Agreement bearing Larry's signature, a document he did not recall signing.
In November 1998 the Bargers sued Oakwood, Edmondson, and Clary on various contract and tort theories. The gravamens of the theories were the nearly $18,000.00 increase in the purchase price shown on the recently received copy of the Contract to Purchase and Deposit Agreement and the fraudulent inducement or procurement of the Arbitration Agreement.
On December 30, 1998, Oakwood moved to compel arbitration. Oakwood attached a copy of the arbitration agreement to its motion. The agreement reads:
"ARBITRATION AGREEMENT
 "This Arbitration Agreement (`Agreement') is executed contemporaneously with, and as an inducement and consideration for, an installment or sales contract (`Contract') for the purchase of a manufactured home (`Home') as described in the Contract by the purchaser(s) (`Purchaser') with Oakwood Mobile Homes Inc. DBA OAKWOOD MOBILE HOMES INC. (`Retailer'). The parties hereto acknowledge that this Agreement is part of the Contract and that the Contract evidences a transaction in interstate commerce governed by the Federal Arbitration Act. This Agreement is binding on and inures to the benefit of the Purchaser, the Retailer, and their successors and assigns. This Agreement is also for the benefit of the manufacturer, and any entity providing financing and their successors and assigns, who may elect to submit any dispute covered by this Agreement to binding arbitration by providing written notice to the Retailer and the Purchaser *Page 456 
within 60 days of the date any complaint is served upon them.
 "All claims, disputes and controversies arising out of or relating in any way to the sale, purchase, or occupancy of the Home or of any goods or insurance products offered or sold in connection with the contract, or arising out of the financing of the Home, including but not limited to any negotiations between the parties, the design, construction, performance, delivery, condition, installation, financing, repair or servicing of the Home, including claims for equitable relief or claims based on contract, tort, statute, warranty, or any alleged breach, default, negligence, wantonness, fraud, misrepresentation, suppression of fact, or inducement, will to the fullest extent permitted by Federal law be resolved by binding arbitration administered by the American Arbitration Association (`AAA') under its Commercial Arbitration Rules. Notwithstanding the above, no act to take or dispose of collateral securing payment under the Contract, (including without limitation the exercise of any rights under a mortgage, deed of trust or security interest, with or without judicial process, or obtaining a writ of attachment or sequestration), shall be subject to this Arbitration Agreement. Any challenges to the validity or enforceability of this Agreement shall be determined by the arbitrator(s) in accordance with the provisions of the Federal Arbitration Act and the Commercial Arbitration Rules of the AAA. Copies of the rules may be obtained by writing the AAA at 428 East Fourth Street, Suite 300, Charlotte, North Carolina 28202-2431.
 "Arbitration may be initiated by any party by sending written notice of its intention to arbitrate (`Notice') to Retailer at its registered agent and Purchaser's last known address and to the AAA office as set forth above. The Notice will contain a description of the claim, dispute, or controversy and the remedy requested. In no event may any demand for arbitration be made after the date when the institution of a legal or equitable proceeding based on the claim, dispute or controversy in question would be barred by the applicable statute of limitations or laches. For any claim requesting relief or an award of less than Twenty Thousand Dollars ($20,000.00), the arbitration will be conducted before a single independent and impartial arbitrator selected pursuant to the Commercial Arbitration Rules of the AAA. Unless otherwise mutually agreed, all arbitrators shall be lawyers licensed by the State in which the claim arises, with five or more years experience in the practice of Commercial Law and approved to be on an AAA Panel.
 "The arbitrator will deliver the decision or award in writing with a summary of the reasons for the decision or award, and the decision or award shall be final and binding on all parties, their successors and assigns. In an appropriate case, the arbitrator may grant a motion to dismiss the claim or a motion for summary disposition of the claim. Judgment on the decision or award may be entered by any court having jurisdiction. Fees and costs of the arbitration will conform to the AAA fee schedule in effect at the time of the arbitration and will be shared equally by the parties.
 "This Agreement shall not prevent any party from requesting a consumer claim inspection by any authorized state agency, and such agency must be allowed to complete any informal dispute resolution prior to any arbitration proceeding.
 "This Agreement is an election to resolve claims, disputes, and controversies by arbitration rather than the judicial process. IT IS UNDERSTOOD THAT THE PARTIES WAIVE ANY RIGHT TO A JURY TRIAL OR A TRIAL IN COURT. The parties understand that the rules applicable to arbitrations and the rights of parties in arbitration differ from the rules and rights applicable in court. The arbitration will be conducted *Page 457 
at an appropriate time and place set by the arbitrator or panel in the county of sale. Purchaser(s) acknowledge receipt of a copy of this Agreement. This Agreement dated 8/1/97."
The Bargers filed an opposition to Oakwood's motion, along with supporting affidavits. They claimed that Larry Barger's signature on the arbitration agreement was induced or procured by fraud. The Bargers submitted affidavits from Larry Barger, Donna Barger, and Vernon LeCroy, a coworker of Larry Barger.
Larry Barger testified by affidavit, in pertinent part, as follows:
 "2. In late July 1997, my wife, my mother-in-law, and I went to the Oakwood Mobile Homes lot in Northport, Alabama, seeking to purchase a mobile home. We were met there by salesman Jerry Edmondson. Mr. Edmondson made numerous representations to us regarding the features and purchase price of a certain mobile home. In reliance upon the representations made by him, as well as our tour of a mobile home we thought we were purchasing, my wife and I agreed to purchase the mobile home. I agreed to come back to the lot the next day to sign the necessary paperwork.
 "3. The next day, my wife and I went to the Oakwood Mobile Homes lot, where we first viewed a videotape pertaining to the purchase of a mobile home. Thereafter, Jerry Edmondson presented me with certain documents, one of which was a document entitled, `Contract to Purchase and Deposit Agreement.' This contract showed a total sales price for the mobile home we had agreed to purchase of $22,000. This contract also listed the various optional equipment and accessories which we had agreed to buy. I signed the Contract to Purchase in the presence of my wife and Jerry Edmondson. Jerry Edmondson then signed the documents on behalf of Oakwood. At no time on that date did I sign any document containing an arbitration agreement.
 "4. After signing the contract, I was given a set of mobile home keys. I was also told by Jerry Edmondson that he would arrange to move the mobile home we agreed to purchase as soon as possible. Based upon my conversations with Jerry Edmondson and the documents which I signed on that date, it was my understanding that I had entered into an agreement to purchase the mobile home.
 "5. The next day, Jerry Edmondson called me at my place of business and told me that before he could move the mobile home to my lot, I would have to sign additional papers for insurance purposes. Later that day, Mike Clary, the manager of the Oakwood lot, brought a group of papers to me. He stated that I needed to sign these papers for insurance purposes in order to move the mobile home from the Oakwood lot to my lot. I signed the group of papers which were printed, but which contained no handwritten or typewritten information. I signed these papers only because I relied upon the representations of both Jerry Edmondson and Mike Clary that these documents were to be used only for insurance purposes so that my mobile home would be moved.
 "6. Approximately ten (10) months after we bought the mobile home, we received copies of papers from Oakwood Mobile Homes which purported to be our sales documents. We did not receive a copy of the contract which I had signed which contained the sales price of $22,000. Instead, we received a contract which showed a cash price of $40,014.23, a copy of which is attached hereto as Exhibit A. I know that I never signed a contract containing a sales price of this amount. Also in the papers we received from Oakwood was a copy of an Arbitration Agreement, a copy of which is attached hereto as Exhibit B, which appears to be signed by me. I know that I *Page 458 
did not sign this document on the day that I purchased the mobile home.
 "7. The contract which I signed on the date of purchase which contained a $22,000 sales price was signed by Jerry Edmondson. The contract provided to me ten (10) months later was signed by Mike Clary. Mr. Clary was never present on the date I purchased our mobile home.
 "8. I was confused and upset upon receiving a copy of a contract to purchase a mobile home which contained a cash price almost double what I agreed to pay. I now believe that the Defendants switched paperwork and that the amounts shown on the $40,014.23 contract were added to a blank contract which I apparently signed the day after the purchase. My belief is bolstered by the fact that my mother-in-law, Eloise Herron, has given me a copy of a contract which was on file under her name at Oakwood Mobile Homes. This contract purports to be a contract signed by me for a $40,014.23 mobile home. However, even though my name appears on the second page of that contract, I did not sign my name to that contract. This signature is a forgery. This contract with the forged signature is attached hereto as Exhibit C.
 "9. Never at any time have I agreed to relinquish my right to a trial by jury. Never at any time has anyone ever explained to me anything about an arbitration agreement. Even though the Arbitration Agreement produced by Defendants appears to contain my signature, I had no intent nor did I consent to enter into any agreement pertaining to arbitration."
The affidavit testimony of Donna Barger corroborates Larry Barger's affidavit testimony that, in the presence of Jerry Edmondson, he signed a contract for the purchase of a mobile home, the contract showed a purchase price of $22,000, and he did not sign an arbitration agreement when he signed the contract. The affidavit testimony of Vernon LeCroy corroborates Larry Barger's statement that Mike Clary came to Larry's place of business and told Larry to sign some papers for insurance purposes so that the mobile home could be moved, and that Larry signed six or seven documents at the request of Clary.
Oakwood filed a brief in support of its motion to compel arbitration. Oakwood argued that fraud in the inducement of the contract does not prohibit arbitration of the Bargers' claims. In addition to its brief, Oakwood submitted an affidavit from Clary, wherein he stated that in June 1997 the Bargers and Jerry Edmondson completed a loan application which was denied two days after its submission for approval. Clary stated also that, for five weeks after the denial of their loan application, the Bargers constantly called and visited Edmondson. Clary stated that he tried several times to have the Bargers' loan application approved but did not succeed in that endeavor. He stated further that "in August 1997," one of Oakwood's loan officers approved the Bargers' loan application and that Jerry Edmondson closed the loan on "August 1, 1997." Denying taking any documents to Larry Barger's place of business, Clary stated that Larry Barger signed all of the "contractual papers in our offices including the arbitration agreement on August 1, 1997."
Following the submission of briefs, affidavits, and the arguments of counsel, the trial court entered an order denying Oakwood's motion to compel arbitration. The order stated that the Bargers had denied that they agreed to arbitration and that they claimed that Oakwood fraudulently induced Larry Barger to sign the arbitration agreement.
Oakwood appeals. On appeal, Oakwood contends that, because the specific language of the arbitration agreement requires arbitration of the validity or enforceability of the agreement, the trial court erred in denying Oakwood's motion to compel arbitration. *Page 459 
"Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question `who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." FirstOptions of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). Moreover, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." Id. at 944. "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is `clea[r] and unmistakabl[e]' evidence that they did so." Id. at 944. See also AT T Technologies, Inc. v. Communications Workersof America, 475 U.S. 643 (1986).
The arbitration agreement signed by Larry Barger contains clear and unmistakable language that the validity and enforceability of the agreement is subject to arbitration:
 "Any challenges to the validity or enforceability of this Agreement shall be determined by the arbitrator(s) in accordance with the provisions of the Federal Arbitration Act and the Commercial Arbitration Rules of the AAA."
However, this language does not resolve the question of arbitrability. Larry Barger and Donna Barger claim that Clary fraudulently induced Larry into signing the arbitration agreement and that, therefore, their claims should be resolved by the trial court. Allstar Homes, Inc. v. Waters, 711 So.2d 924 (Ala. 1997).
In Allstar Homes, this Court held that "[i]n determining whether there is clear and unmistakable evidence that the parties agreed to submit the issue of arbitrability to the arbitrator, `the related and antecedent issue of whether an agreement to arbitrate is a contract of adhesion, fraudulently induced, or otherwise revocable, is an issue for the court as well. . . .'" 711 So.2d at 929 (quoting Aviall, Inc. v. Ryder System, Inc.,913 F. Supp. 826, 831 (S.D.N.Y. 1996). See also Prima Paint Corp. v.Flood Conklin Mfg. Co., 388 U.S. 395 (1967). Fraud in the inducement consists of one party's misrepresenting a material factconcerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action. See Reynolds v. Mitchell, 529 So.2d 227 (Ala. 1988).
Larry Barger's assertion — that he signed the arbitration agreement in reliance upon Clary's statement that Larry was signing papers for insurance purposes so that the mobile home could be moved — is better characterized as a claim of fraud in the factum. Fraud in the factum occurs when a party "procures a[nother] party's signature to an instrument without knowledge of its true nature or contents." Langley v. Federal Deposit Ins.Corp., 484 U.S. 86, 93 (1987). See also Drinkard v. EmbalmersSupply Corp., 244 Ala. 619, 14 So.2d 585 (1943), and Burroughs v.Pacific Guano Co., 81 Ala. 255, 1 So. 212 (1887). Fraud in the factum constitutes ineffective assent to the contract. Cancanonv. Smith Barney, Harris, Upham Co., 805 F.2d 998 (11th Cir. 1986).
In Cancanon, a Smith Barney employee represented to the Cancanons that they were signing a money market account agreement when in fact they were signing a securities account agreement. The Cancanons, who could not read English, relied upon the Smith Barney employee's representation when they signed the securities account agreement. The securities account agreement contained an arbitration provision. Thereafter, the Smith Barney employee handled 93 separate transactions in the securities account that resulted in earned commissions of $38,693 and the near exhaustion of the Cancanons' principal *Page 460 
of $74,657.71. After the Cancanons sued Smith Barney, Smith Barney moved to compel arbitration. The Cancanons asserted the defense of fraud in the factum on the ground that they never intended to open a securities account.
The United States District Court compelled arbitration of the Cancanons' negligence, civil theft, and fraud claims but denied arbitration of the Cancanons' claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Smith Barney appealed and the Cancanons cross-appealed. Holding that claims of fraud in the factum or of lack of assent to a contract are not subject to arbitration, the Court of Appeals for the Eleventh Circuit reversed that portion of the District Court's order compelling the Cancanons to arbitrate their state-law claims. The Eleventh Circuit affirmed that portion of the District Court's order denying arbitration of the Cancanons' Securities Exchange Act claim.
Other courts have held that claims of fraud in the factum or of lack of assent to a contract are not subject to arbitration.Chastain v. Robinson-Humphrey Co., 957 F.2d 851 (11th Cir. 1992);Three Valleys Mun. Water Dist. v. E.F. Hutton Co., 925 F.2d 1136
(9th Cir. 1991); National R.R. Passenger Corp. v. Boston MaineCorp., 850 F.2d 756 (D.C. Cir. 1988); Brotherhood of Teamsters Auto Truck Drivers Local No. 70 v. Interstate Distrib. Co.,832 F.2d 507 (9th Cir. 1986); Par-Knit Mills, Inc. v. StockbridgeFabrics Co., 636 F.2d 51 (3d Cir. 1980); N D Fashions, Inc. v.DHJ Indus., Inc., 548 F.2d 722 (8th Cir. 1976); General Media,Inc. v. Shooker, (No. 97 Civ. 510, July 16, 1998) (S.D.N.Y. 1998) (not published in F. Supp.); Rainbow Investments, Inc. v. Super 8Motels, Inc., 973 F. Supp. 1387 (M.D.Ala. 1997); WMXTechnologies, Inc. v. Jackson, 932 F. Supp. 1372 (M.D.Ala. 1996);Nuclear Elec. Ins. Ltd. v. Central Power Light Co., 926 F. Supp. 428
(S.D.N.Y. 1996); Kyung Lee v. Pacific Bullion (New York),Inc., 788 F. Supp. 155 (E.D.N.Y. 1992); Dougherty v. Mieczkowski,661 F. Supp. 267 (D.Del. 1987); Shearson Lehman Bros., Inc. v.Crisp, 646 So.2d 613 (Ala. 1994). But see R.M. Perez Assocs.,Inc. v. Welch, 960 F.2d 534 (5th Cir. 1992), and C.B.S. EmployeesFed. Credit Union v. Donaldson, Lufkin Jenrette Secur. Corp.,912 F.2d 1563 (6th Cir. 1990).
In Shearson Lehman Bros., supra, this Court recognized that a challenge to avoid or to rescind a contract is subject to arbitration but a challenge to the very existence of a contract is not subject to arbitration. A claim of fraud in the factum is a challenge to the very existence of the contract. Cancanon, supra. In Shearson Lehman Bros., this Court adopted the rationale ofThree Valleys Municipal Water District v. E.F. Hutton Co.,925 F.2d 1136 (9th Cir. 1991), which involved a claim of fraud in the factum relating to a contract containing an arbitration clause, and which cited Cancanon, supra. In Three Valleys the Court of Appeals for the Ninth Circuit stated that only a court determines whether a contract exists inasmuch as an arbitrator's authority to resolve disputes is derived from the contract. "A contrary rule would lead to untenable results. Party A could forge party B's name to a contract and compel party B to arbitrate the question of the genuineness of [his or her] signature." Three Valleys, 925 F.2d at 1140. Therefore, because this Court has adopted the rationale of Three Valleys, a claim of fraud in the factum is to be decided by a trial court or a jury.
The Bargers claim that Clary represented the documents as being "for insurance purposes," when, in fact, one of the documents was an arbitration agreement, which Larry never knowingly signed as an arbitration agreement. Therefore, we treat the Bargers' claim of fraud in the inducement as a claim of fraud in the factum. The critical issue is whether the Bargers presented substantial evidence to support a claim of fraud in the factum. *Page 461 
Fraud in the factum is a traditional fraud. A claim of fraud, including such fraud as fraud in the factum, requires the party making the claim to prove by substantial evidence that he or she reasonably relied on the alleged misrepresentation. ForemostIns. Co. v. Parham, 693 So.2d 409 (Ala. 1997). This Court explained reasonable reliance in Torres v. State Farm Fire Cas.Co., 438 So.2d 757 (Ala. 1983):
 "If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. . . .
 "`If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volenti non fit injuria".'
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
438 So.2d at 759.
Any falsity of Edmondson and Clary's alleged misrepresentation that the document was "for insurance purposes" is apparent on the face of the document itself. The document signed by Larry Barger is headed by the title "ARBITRATION AGREEMENT." Larry Barger did not state in his affidavit that he cannot read or that Clary prevented him from reading the documents he signed. Thus, Larry's reliance on the representation of Clary was not reasonable inasmuch as Larry would have had to have closed his eyes to the truth to believe that the document was not an arbitration agreement. Moreover, the representation that the document was for insurance purposes does not exclude the interpretation that Oakwood did need the arbitration agreement to maintain its insurance coverage and rates for its business operations relating to the sale and delivery of the mobile home.
Accordingly, the Bargers' claim of fraud in the inducement, better characterized as fraud in the factum, is not meritorious. Therefore, the trial court erred in denying Oakwood's motion to compel arbitration of the Bargers' claims. The order of the trial court is reversed and this cause remanded to the trial court for entry of an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Maddox, See, Lyons, Brown, and England, JJ., concur.
Hooper, C.J., and Houston, J., concur in the result.